1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RICHARD J. GRAD (SBN 119800)
rgrad@mgae.com
ELIZABETH S. LACHMAN (SBN 261644)
elachman@mgae.com
LAURENCE CHENG (SBN 306299)
laurence.cheng@mgae.com
MGA ENTERTAINMENT INC.
9220 Winnetka Avenue
Chatsworth, CA 91311
Telephone: (818) 894-2525
Fax: (818) 895-0771

Attorneys for Plaintiff
MGA Entertainment Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| MGA ENTERTAINMENT INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>GIOCHI PREZIOSI S.P.A., an Italian company; and DOES 1 through 10, inclusive.<br><br>Defendants. | CASE NO:<br><br><br>**COMPLAINT FOR BREACH OF WRITTEN CONTRACT** |
|---|---|

Plaintiff MGA ENTERTAINMENT INC. for its Complaint against GIOCHI PREZIOSI, S.p.A, alleges, on the basis of its own knowledge those matters within its personal knowledge and on information and belief as to everything else:

## I.    PRELIMINARY STATEMENT

1.    MGA is a California-based toy company that designs, manufactures, and sells some of the world's most popular toys.  Giochi Preziosi is an Italian-based toy distributor and manufacturer of licensed toy merchandise.

2.    Between 2017 and 2020, MGA and GP were parties to six merchandising licensing agreements (referred to as "MLAs") which granted GP the conditional right to manufacture and sell licensed merchandise designed with MGA's intellectual property.  For example, backpacks decorated with MGA brand designs, logos, and characters.  Copies of the MLAs (with minimal redactions to protect pricing terms) are attached as **Exhibits A** through **F**.

3.    Pursuant to the MLAs, GP, broadly speaking, designed MGA-licensed products, submitted them to MGA for MGA's approval before sale, sold the licensed merchandise, and then remitted a royalty to MGA, calculated as a percentage of GP's sales of that MGA-branded merchandise.

4.    A 2020 audit commissioned by MGA and conducted by a third-party auditing firm uncovered that GP breached the MLAs by (i) selling products bearing MGA's intellectual property but for which GP did not seek or obtain MGA's prior final approval; (ii) underreporting sales for which GP was required to pay a royalty; (iii) failing to make all royalty payments owed to MGA; and (iv) exceeding contractual limits on trade discounts.

5.    According to the audit report, MGA's damages resulting from GP's breaches total approximately $1.2 million.  By this action, MGA seeks to recover the damages it sustained as a result of those breaches.

COMPLAINT

## II.    THE PARTIES

6.      Plaintiff MGA ENTERTAINMENT INC. ("**MGA**") is a California corporation and consumer toy company having an address and principal place of business at 9220 Winnetka Ave., Chatsworth, California 91311.

7.      Upon information and belief, Defendant GIOCHI PREZIOSI S.P.A. ("**GP**") is an Italian company with a principal place of business at Via delle Primule 5 Cogliate (MB), Italy.

8.      Doe Defendants 1 through 10 are individuals and/or entities whose true names and capacities are presently unknown to Plaintiff.  At such time as Doe Defendants' true names and capacities become known to Plaintiff, Plaintiff will seek leave to amend this Complaint to insert the true names and capacities of such individuals or entities.

9.      At all relevant times, Defendants, including Does 1 through 10, inclusive, and each of them, were and still are the partners, agents, employers, and/or employees of the other Defendants; and each of them, in so doing the things alleged, were acting within the course and scope of said partnership, agency, or employment; and each of them, in so doing the things alleged, were acting at all times with the knowledge, consent, and authorization of each of the other Defendants.

10.      At all relevant times, Defendants, including Does 1 through 10, inclusive, and each of them, are the alter egos of each other; are characterized by a unity of interest in ownership and control among themselves such that any individuality and separateness between them have ceased; are a mere shell instrumentality and conduit through which Defendants carried on their business by use of each other's names; completely controlled, dominated, managed, and operated each other's business to such an extent that any individuality or separateness of the Defendants does not and did not exist; completely failed to observe any corporate formalities; and intermingled the assets of each other, and other entities affiliated with

them, to suit the convenience of themselves and in order to evade legal obligations and liability.

11.    Defendants are in some manner responsible for the acts alleged herein and the harm, losses, and damages suffered by Plaintiff.

### III.    JURISDICTION AND VENUE

12.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. Section 1332, in that this is a civil action between a citizen of a state and a citizen of a foreign state, in which foreign states are additional parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.    Defendant GP has stipulated to personal jurisdiction in this judicial district in all of the written contracts at issue in this action. *See* Exs. A – F, Terms and Conditions § 21.  Further, this Court has jurisdiction over GP in this judicial district because GP regularly conducts, transacts, and/or solicits business in California and in this judicial district, and/or derives substantial revenue from business transactions in California and in this judicial district, and/or otherwise avails itself of the privileges and protections of the laws of the State of California such that this Court's assertion of jurisdiction over Defendant does not offend traditional notions of fair play and due process, and/or Defendant's infringing actions caused injury to Plaintiff in California and in this judicial district such that Defendant should reasonably expect such actions to have consequences in California and in this judicial district.

14.    Venue is proper under 28 U.S.C. Section 1391(b)(2) because GP conducts, transacts, and/or solicits business in this judicial district.  Venue also is proper under 28 U.S.C. Section 1392(b)(3) because defendant GP has stipulated to this Court's personal jurisdiction with respect to claims arising out of the subject MLAs. *See* Exs. A – F, Terms and Conditions § 21.

# IV.    FACTUAL ALLEGATIONS

15.    MGA Entertainment is the fastest-growing privately held toy company in the United States.  Founded in 1982 and headquartered in Chatsworth, California, MGA designs and manufactures innovative consumer products and entertainment, including toys, games, dolls, consumer electronics, and sporting goods.  The MGA family includes award-winning brands such as L.O.L. Surprise!™, Little Tikes®, Rainbow High™, Bratz®, Na! Na! Na! Surprise™, Baby Born® Surprise, Zapf Creation®, and more.

16.    In addition to being a toy distributor, GP is also a licensee in the toy business.  Generally, a licensee pays for a license to use another company's intellectual property—its trademarks, copyrighted work, branded designs and logos—and sell merchandise branded with that company's intellectual property.  For example, one of MGA's best-selling brands of toys is the L.O.L. Surprise! dolls. MGA manufacturers and sells these dolls.  Companies around the world license from MGA the L.O.L. Surprise! brand, including its logos, artwork, designs and themes, so that they can produce and sell branded merchandise such as pencils, stickers, backpacks, stationary, and other products that MGA does not manufacture.

17.    When a brand or franchise becomes incredibly popular, like MGA's L.O.L. Surprise! dolls, licensing opportunities can mean significant revenue both for licensor and licensee.  The licensor can generate revenue from outside its primary market (MGA does not manufacture school backpacks, but you can get an LOL Surprise Doll-themed backpack if you want one!), and the licensee who, in exchange for a royalty and without having to invest the millions of dollars in developing a popular product or brand, can profit from a brand's popularity when a consumer pays a premium for an otherwise generic backpack, pencil, or notebook that is branded with that popular brand's themes, characters, and other intellectual property.

COMPLAINT

**A.    The Merchandising License Agreements at Issue**

18.    Between 2017 and 2020, pursuant to six MLAs between MGA and GP, GP was authorized to sell MGA-licensed merchandise across various European territories.  The MLAs, attached as **Exhibits A** through **F** to this Complaint, concern the following time periods and geographical territories:

a.    **MLA201701619 (Ex. A)**: between MGA and GP from September 1, 2017 to June 30, 2019 for the territories of Italy, San Marino, Vatican City, and Canton Ticino, entered on January 1, 2018;

b.    **MLA201801766 (Ex. B)**: between MGA and GP from May 1, 2018 to March 31, 2020 for the territories of Italy, San Marino, Vatican City, Switzerland, Spain, Portugal, Andorra, Greece, Cyprus, Malta, United Kingdom, and Ireland, entered on February 29, 2018;

c.    **MLA201801832 (Ex. C)**: between MGA and GP from August 1, 2018 to March 31, 2020 for the territories of Sweden, Finland, Norway, Iceland, Denmark, Poland, Czech Republic, Hungary, Romania, Bulgaria, Serbia, Montenegro, Albania, Bosnia and Herzegovina, Kosovo, Macedonia, Montenegro, Slovenia, Ukraine, Latvia, Estonia, and Lithuania, entered on August 1, 2018;

d.    **MLA201801915 (Ex. D)**: between MGA and GP from December 1, 2018 to December 31, 2020 for the territories of Italy, San Marino, and Vatican City, entered on November 13, 2018;

e.    **MLA201902134 (Ex. E)**: between MGA and GP from July 1, 2019 to December 31, 2020 for the territories of Italy, San Marino, and Vatican City, entered on May 21, 2019; and

f.    **MLA201902335 (Ex. F)**: between MGA and GP from December 1, 2019 to December 31, 2020 for the territories of Italy, San Marino, and Vatican City, entered on November 14, 2019.

19.    The MLAs contained the following material terms:

a. GP was granted a limited right to sell approved merchandise in the designated geographical territory (*see, e.g.*, Ex. A § 3 ["Licensed Territory"]);

b. For approved licensed products, GP paid MGA a royalty for the use of MGA's intellectual property (*Id*. § 7(b) ["Royalty"]);

c. GP was not permitted to sell any MGA-branded merchandise unless it complied with the approval process, which required that GP submit samples of the proposed licensed product for MGA's approval at all stages of development and production, including pre-production and final production (*Id*. §13 ["Approvals"], Standard Terms & Conditions, § 7 ["Artwork; Approvals; Samples; Quality Control"]);

d. GP's failure to comply with the approval process was grounds for termination and GP would have to pay a fee to reinstate the agreement. This fee is calculated as a 2x multiple of the royalties owed if the product had been duly authorized by MGA before its sale (*Id*., Standard Terms & Conditions § 13(a)(i));

e. MGA may audit GP's books and records as they pertain to GP's performance of and compliance with the MLAs (*Id*. § 2(e) ["Audit Rights"]);

f. MGA's final approval of a product shall not "constitute a waiver or modification of Licensee's obligations under any other provision of this Agreement." (*Id*., Standard Terms & Conditions, § 7 (d) ["Artwork; Approvals; Samples; Quality Control"]);

g. Modifications of the MLAs are required to be "in writing signed by both parties hereto." (*Id*., Standard Terms & Conditions, § 16 ["No Waiver or Modification"]; and

h. The MLAs are governed by California law and the parties agree that any suit, action or proceeding be instituted in the United States District Court for the Central District of California or in any Los Angeles County court of competent jurisdiction.

COMPLAINT

**B.    An Audit Uncovers Breaches by GP**

20.    Pursuant to its right under the MLAs, MGA commissioned an audit of GP's books and records.  The audit, performed by a third-party auditing firm, discovered that GP had breached the MLAs in several respects, including by selling MGA-branded merchandise that MGA had not yet approved for sale and distribution.  GP also underreported sales and granted discounts and returns on merchandise in excess of permissible amounts.  The auditing firm produced a summary report of its findings along with a calculation of MGA's resulting damages.  As calculated by the auditors in their December 2020 report, MGA's damages totaled $1.2 million, with interest:

| | |
|---|---|
| Sale of unauthorized products | $ 914,383 |
| Underreported sales | $ 52,429 |
| Excessive discounts and returns | $ 117,413 |
| Outstanding Payments | $ 1,161 |
| Cost of Audit | $ 11,437 |
| **Total damages** | $ 1,098,251 |
| **With interest** | $ 1,228,908 |

**C.    GP Sold Products That MGA Did Not Approve For Sale**

21.    Each of the MLAs requires GP to comply with a robust approval process before it can sell products with MGA's name, brands, or logos.  Section 13 of the MLAs states:

> **At all stages of development**, manufacturing, distribution, and sale, the **Licensed Articles** and any related packaging and advertising **must be approved by Licensor in writing through MGA's online product approval system or as otherwise directed by MGA before** promotion,

**distribution or sale of any Licensed Articles by Licensee.** Such approvals or disapprovals are due within ten (10) business days from the date of receiving materials from Licensee and are at Licensor's sole and absolute discretion, and any submission not approved in writing is deemed disapproved. In any case of disapprovals, Licensor shall explain the related reasons in order to allow the Licensee to modify the unapproved sample.

*See, e.g.*, Ex. A, § 13 (emphasis added).

22.    Section 7 of the Standard Terms and Conditions appended to the MLAs states:

(b) **Approvals**: Licensee shall submit to Licensor and Licensor shall have absolute approval over all artwork (whether Artwork or artwork created by Licensee and/or its designees), all Licensed Articles and all Collateral Materials at all stages of development and production. **Licensee may not manufacture, use, offer for sale, sell, advertise, ship or distribute any Licensed Articles or Collateral Materials without receiving Licensor's final written approval and furnishing Licensor with the minimum number of samples stated in (e) below.**

*See, e.g.*, Ex. A, Terms and Conditions § 7 (emphasis added).

23.    GP's compliance with all stages of the approval process was critically important. MGA spends millions and millions of dollars in research and development and the marketing and building of each brand. Once a brand has achieved critical value in the market, it is imperative that the value of that brand, including its intellectual property, be protected. The L.O.L. Surprise! brand, for example, is MGA's current best-selling brand. It is regularly ranked on the best-selling toy lists

9

by market researchers and has even been commercialized into a Netflix animated feature.

24.    The licensing approval process helps ensure that the licensed merchandise, even though it is not manufactured by MGA, is consistent with the brand's style guide, look and feel, and that the products are of a quality consistent with MGA standards.  If a licensee uses out-of-date artwork or incorrect color schemes, or produces cheap quality merchandise, that can cause damage to the value of the brand (and related IP) from the consumer's point of view.  After the concept is approved, the product is approved at a "pre-production" stage, and finally, a "final production" stage.

25.    The creation, development, and production of merchandise is an iterative process that usually requires adjustments at each stage of the process.  Typically, a licensee will begin by submitting a "concept" to MGA – a drawing or visual representation of the proposed branded product.  MGA will provide feedback and either approve the concept as is or ask that certain changes be made and that the project re-submitted before proceeding to the next stage.

26.    As shown in the table below, MGA's audit discovered that GP first invoiced, meaning that it sold, at least eight different products without obtaining MGA's final approval:

### Schedule 2b – Approval stages in Mediabox and first invoice date

| SKU | Description | Pre-production Approval | First Invoice Date | Production Approval |
|---|---|---|---|---|
| CA301000 | CALZETTONE LOL '19 | 20/09/2018 | 26/11/2018 | 29/04/2019 |
| LL905000 | DIARIO 10M LOL'18 | 03/05/2018 | 26/06/2018 | 20/07/2018 |
| LL913000 | Z. ROUND XL LOL'19 | 26/12/2018 | 14/05/2019 | 09/07/2018 |
| LL914000 | Z. EST.MULTI LOL'19 | 13/12/2018 | 14/05/2019 | 12/07/2019 |
| LL915000 | TROLLEY 3RSPINN LOL'19 | 26/12/2018 | 14/05/2019 | 12/07/2019 |
| LL930000 | DIARIO STAND LOL'19 | 01/12/2018 | 29/05/2019 | 16/07/2019 |
| LL931010 | MINI TROLLEY | 26/10/2018 | 19/06/2019 | 12/07/2019 |
| PA301000 | PASQUALONE LOL '19 | 18/12/2018 | 20/03/2019 | 17/04/2019 |

27.    Each of the MLAs contains a prohibition on the sale of "Unauthorized Product" that enables MGA to immediately terminate the Agreement if GP "makes,

1   sells, offers for sale, uses or distributes any Licensed Article without having final

2   written approval of Licensor …" Ex. A, Standard Terms & Conditions § 13(a)(i).

3       28.    GP's unauthorized sales were discovered for the first time during MGA's

4   audit.  MGA had the right to terminate the Agreement had it known about GP's

5   unauthorized sales.  Had that occurred, MGA would have had the option to reinstate

6   the MLA if GP agreed to pay MGA "a royalty in an amount equal to two-hundred

7   percent of the Royalty that would have applied to the sale of Licensed Articles if they

8   had received Licensor's final written approval." Ex. A, Standard Terms & Conditions

9   § 13(a)(i).  Using this 2x royalty calculation set forth in the MLA, the auditor's report

10  calculated that for the eight products that GP sold without final approval, MGA is

11  owed $914,383 plus $110,626 in interest.

12      **D.    GP Underreported Sales**

13      29.    The audit also revealed discrepancies between the sales figures GP

14  reported to MGA and those reflected in GP's system-generated sales reports, totaling

15  $378,286 in net omitted sales.  That figure represents $52,529 in unpaid royalties,

16  plus $6,714 in interest.

17      **E.    GP Exceeded Contractual Limits on Trade Discounts**

18      30.    Each of the MLAs also contains a limit on allowances, markdowns,

19  returns, and customary trade discounts.

20      31.    MLA201701619 states that: "The combined total of allowances,

21  markdowns, returns and customary trade discounts shall not exceed thirty (30%)

22  percent of the actual invoiced billings for Licensed Articles shipped to Licensee's

23  retail customers."

24      32.    MLA201801766 states that: "Allowances, markdowns and returns shall

25  not exceed ten percent (10%) of Licensee's actual invoiced billings for the Licensed

26  Articles shipped to Licensee's retail customers; customary trade discounts actually

27  granted by Licensee shall not exceed forty percent (40%) of the actual invoiced

28  billings for Licensed Articles shipped to Licensee's retail customers; and the

combined total of allowances, markdowns, returns and customary trade discounts shall not exceed fifty percent (50%) of the actual invoiced billings for Licensed Articles shipped to Licensee's retail customers."

33.     MLA201902134 states that: "Allowances, markdowns and returns shall not exceed ten percent (10%) of Licensee's actual invoiced billings for the Licensed Articles shipped to Licensee's retail customers; customary trade discounts actually granted by Licensee shall not exceed forty percent (40%) of the actual invoiced billings for Licensed Articles shipped to Licensee's retail customers; and the combined total of allowances, markdowns, returns and customary trade discounts shall not exceed fifty percent (50%) of the actual invoiced billings for Licensed Articles shipped to Licensee's retail customers."

34.     The audit revealed that GP deducted discounts and returns from its royalty calculations that exceed the allowable limits outlined in the MLAs.  The disallowed deductions equate to additional royalties of $117,413, plus $13,035 in interest.

35.     The audit also revealed that GP owes $1,161 in outstanding payments, plus $282 in interest.  Under the MLAs' provision regarding late royalty payments, GP owes $1,428 due to late and/or insufficient royalty payments.

36.     Finally, because the audit revealed a deficiency exceeding five percent (5%) or more of royalties paid during any accounting period, GP is responsible for the cost of the audit in the amount of $11,437.

## FIRST CAUSE OF ACTION

### Breach of Written Contract

37.     Plaintiff restates and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

38.     MGA and GP entered into six MLAs, attached to this Complaint as Exhibits A through F.

39.     The MLAs contain provisions that, *inter alia*, prohibit the sale of unauthorized products; restrict limits on trade discounts; require GP to cover the costs of an audit if the audit deficiency exceeds a minimum; and require interest payments on late royalty payments.

40.     GP materially breached the provisions of the MLAs as set forth above.

41.     MGA has performed all the promises and things on its part to be done or performed under the MLAs, except where performance has been excused or waived.

42.     At all relevant times, MGA was willing and able to perform its obligations under the MLAs.

43.     As a direct and proximate result of GP's breaches of the MLAs, MGA has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF AND JURY DEMAND

44.     **WHEREFORE**, MGA prays for judgment against GP as follows:

a.     For general and actual damages, according to proof at trial, plus accrued interest;

b.     For MGA's reasonable attorneys' fees;

c.     For all costs of suit; and

d.     For such other and further relief as the Court may deem just and equitable.

45.     MGA demands a jury trial on any and all issues upon which a jury trial is appropriate.

DATED:   March 21, 2021                    **MGA ENTERTAINMENT INC.**

By:   /s/ Elizabeth S. Lachman
      Richard J. Grad
      Elizabeth S. Lachman
      Laurence Cheng
      Attorneys for Plaintiff MGA
      Entertainment Inc.

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT